## PUGH *v.* SCHINDLER.

1. BOUNDARIES — ADVERSE POSSESSION — PERMISSIVE OCCUPANCY.
   Where adjoining landowners erect a division fence under an agreement that, if afterwards found not to be on the true line, it shall be changed to conform thereto, their subsequent occupancy in recognition of the agreement is permissive merely as between themselves, and, however long continued, cannot ripen into a title by adverse possession.

2. SAME—CHANGE OF OWNERSHIP.
   But the possession of a grantee of one of the parties, who enters and occupies in ignorance of such agreement, may be adverse as to the other, though no express notice is given the latter of an intention to hold adversely.

3. SAME—SURVEYS—EVIDENCE.
   Surveyors' records not complying with the requirements of 1 Comp. Laws, § 2622, are inadmissible in evidence.

4. SAME—OLD FENCES—INSTRUCTIONS.
   In an action involving a disputed boundary, it was error to refuse to instruct the jury that "fences of long standing,

erected upon what parties have called the true line, and up to which they have improved and cultivated, are better evidence of the true line than surveys made after the original monuments have disappeared."

Error to Kent; Perkins, J. Submitted January 30, 1901. Decided June 17, 1901.

Ejectment by John A. Pugh against Charles Schindler and others. From a judgment for plaintiff, defendants bring error. Reversed.

*Rodgers, McDonald & Minor*, for appellants.

*Charles E. Ward*, for appellee.

Moore, J. This case was commenced in 1898. It was tried by a jury, who rendered a verdict in favor of plaintiff. From a judgment entered upon the verdict, the case is brought here by writ of error.

The claims of the respective parties were well stated by the circuit judge in his charge to the jury, as follows:

"This is an action of ejectment, brought by the plaintiff to determine the title to a certain strip of land, 28 feet wide at one end and 33 feet at the other, lying between the land owned by the respective parties on section 32 of the township of Alpine, in this county. The plaintiff owns, in addition to other lands, 15 acres in the northwest corner of the southeast quarter of said section, and the defendants own the northeast quarter of the section. So you see the disputed territory is where the northerly side of this 15-acre strip, belonging to the plaintiff, touches the southerly line of the defendants' land, which would be at or near the center of the section, and extending thence easterly the entire width of the 15-acre strip, 307 feet.

"There is no contention here but that the title to the land owned by each of the parties may be traced back to the government; the plaintiff through one Wright, and the defendants through Noel Hopkins, the former owners. It is claimed on the part of the plaintiff that some time in the year 1840, and while Mr. Wright, the plaintiff's predecessor, was the owner of the land on the south, and Noel Hopkins, the defendants' predecessor, was the owner

of the land on the north, for reasons which you will
remember, these adjoining owners became desirous of
establishing, for the time being, a dividing line between
their respective properties; that, to accomplish this pur-
pose, they together projected a line from the government
quarter post on the east line of the section, which was
then standing, westerly towards the center of the section,
and until it crossed the north and south quarter line; that
these owners then and there mutually agreed that the line
thus established should not be considered the permanent
dividing line between their respective properties, but that
the same should be subject to change when the true line
should afterwards be definitely determined by a proper
survey; that soon thereafter a rail fence was built upon
the line so laid out, which fence has remained substan-
tially in the same location, with some changes, which you
will remember, since it was built, in 1841 or '42, until the
present day,— a period of about 60 years.    The plaintiff
further claims that not only did these early owners—
Wright on the one side, and Noel Hopkins on the other—
recognize the undetermined character of this line between
their lands, but that their successors in ownership recog-
nized that the line so established was not final or conclu-
sive, but that it was subject to change when the true line
should be definitely ascertained and determined; and he
claims that by a true survey of the premises, based upon
the original stakes and monuments on the east and west
lines of the section, the true boundary line is 33 feet north
of this old fence at the west end of the strip in contro-
versy, and 28 feet north at the east end.    The plaintiff
further claims that the occupancy of this strip by Noel
Hopkins in his lifetime, and by his successors in title down
to Mrs. Osborn, who purchased in 1885, was merely per-
missive, and that, by reason of the agreement so made
between the original owners, such occupancy could not
and did not ripen into an absolute title, notwithstanding
the great length of time that has elapsed since this old
line was laid out and the fence built, as I have stated.

"On the other hand, the defendants claim that the
fence as now standing upon the premises is located upon
the line which would be indicated by the government
survey dividing these parties' land; in other words, that
the true line is where this fence now stands.    And they
further claim that, whether it is upon the true line or not,
it has stood in its present location ever since the year 1841,

127 MICH.—13.

or thereabouts, and the parties upon both sides have occupied up to it as the dividing line, and have been satisfied with it, and that by their acts they have established the line of the fence as the true boundary line.  They claim also that, by reason of the character and nature of their occupancy of the land upon the north, they have acquired title by adverse possession (which term I will presently explain to you) to this disputed strip.  It is further claimed by the defendants that no such agreement in relation to this fence was ever made between Noel Hopkins and Mr. Wright at the time or just before this old fence was built, as claimed by the plaintiff."

The defendants claim a verdict should have been directed in their favor.  Their counsel say:

"The agreement, if made, as testified to by Noel Hopkins, can have no effect upon the legal rights of the parties to it, or their successors in interest.  It was not an agreement to forbear any legal rights.  The agreement, if made, went no further than the law itself would have gone. The agreement, as testified to, was that, if the fence was not on the true line, they would change it.  The law itself, in the absence of such an agreement, would have compelled them to change it had they been diligent in discovering the error.  It was simply a friendly, neighborly agreement to do what was right in the matter, and to comply with the law without any litigation or trouble. The fence was built upon the line.  The parties agreed that, if they had made a mistake, they would allow it to be corrected.  This was no more than the law would have compelled them to do had they acted within a reasonable time, and within the period fixed by the statute of limitations.  But upwards of half a century cannot be looked upon as a reasonable time.  *Pierson* v. *Mosher*, 30 Barb. 81, is a case on all fours with the case at bar.  If the conclusion reached in that case is the law, it is decisive of this case."

The case cited is very nearly, if not, on all fours with the case at bar, though counsel for plaintiff insists that it can be distinguished.  If it cannot, it is not in harmony with the weight of authority.  There is testimony tending to show in this case that, when the line was run in the year 1840, it was agreed by the owners of the land on each

side of the line that the line so run might not be the true line, and that, when the true line was established, it should control; and that this agreement continued to be recognized by the owners of the land up to a time so recent that sufficient time has not elapsed so that title could be obtained by adverse possession.   If this agreement was in fact made, and continued to be recognized, then the occupancy was a permissive one, and the rule in such a case is, "A mere permissive possession, or one consistent with the title of another, however long continued, can never ripen into a title by adverse possession.   1 Am. & Eng. Enc. Law (2d Ed.), 794, and cases cited therein; *Perkins* v. *Nugent*, 45 Mich. 156 (7 N. W. 757); *White* v. *Hapeman*, 43 Mich. 267 (5 N. W. 313, 38 Am. Rep. 178); *Bunce* v. *Bidwell*, 43 Mich. 542 (5 N. W. 1023); *Bird* v. *Stark*, 66 Mich. 654 (33 N. W. 754); *Smeberg* v. *Cunningham*, 96 Mich. 378 (56 N. W. 73, 35 Am. St. Rep. 613); *City of St. Joseph* v. *Seel*, 122 Mich. 70 (80 N. W. 987).

It is claimed the court erred in charging the jury that, if the occupancy of Mr. Hopkins was permissive, it could not become adverse, even as to his grantees, without giving to the other owners notice of an intention to occupy adversely.   The language used by the circuit judge was as follows:

"In the first place, it is contended by the plaintiff, and I charge you that the law is, that, if the defendants' grantors obtained possession of this land by reason of an agreement to build a fence, and that the fence might be moved upon the true line at any time when it was ascertained to be not correctly located, as claimed by the plaintiff, then the possession so gained would be deemed in law to be permissive, and not adverse.   And the law presumes such permission and consent to continue, and that such possession continued to be permissive, and not adverse, until some act is done or notice given that the possessor no longer holds by reason of such permission, but adversely, and with the intent to claim the land to the exclusion of the true owner, without regard to the location of the true line between them; but, in the absence of such act or notice so changing such possession from a per-

missive to an adverse one, no possession, however long continued, can be the foundation of a title by adverse possession. The defendants, in other words, cannot claim title to the land in dispute upon the theory of adverse possession, if such possession was originally obtained by the consent of the owner of the land, and they went into possession by reason of the permission of such owner, unless the character of such holding was subsequently changed by reason of the change in the intention of the possessor, brought home to the knowledge of the owner, and continued without interruption for 15 years thereafter; for the reason that the possession gained by permission cannot be adverse so long as such possession continues by reason of such permission. And I further instruct you upon this point that the fact that the land on either side of the division line has changed hands since the fence was built would not render a possession adverse as to the subsequent owners which was not adverse as between the parties who built the fence. The situation would remain the same as between subsequent owners, no matter how many times it might be conveyed, unless some acts were done or notice given by the subsequent possessors to change the character of the possession from a permissive to an adverse one."

We think, in the main, this was a correct charge, but some portions of it are not in accord with the law. As is stated in the brief of counsel for plaintiff, "An intention to claim the land is necessary to the acquirement of title by adverse possession. 1 Am. & Eng. Enc. Law (2d Ed.), 789; *Chapman* v. *Crooks*, 41 Mich. 595 (2 N. W. 924)." If a grantee of Mr. Hopkins was informed at the time he made his purchase that the land he bought included all the land inclosed by the fence, and he entered into its occupancy without any knowledge that Mr. Hopkins' occupancy was permissive, and with the belief that he was the owner of the land, and with the intent to occupy as an owner, his intention to claim the land might thus be shown; and, if the occupancy in all other respects met the requirements of an adverse occupancy for the requisite time to acquire title, we think it would be sufficient.

The location of the true line was a matter of dispute. The plaintiff was allowed to introduce in evidence the

record of two surveys. Section 2619, 1 Comp. Laws, provides for the admission of surveyors' records. Section 2622 provides what they must contain to make them admissible. These sections of the statute have been construed in *Smith* v. *Rich*, 37 Mich. 549; *Beeman* v. *Black*, 49 Mich. 598 (14 N. W. 560); *Van Der Groef* v. *Jones*, 108. Mich. 65 (65 N. W. 602). The records were defective within these provisions of the statute, and should not have been received.

The defendants requested the court to charge:

"Unless you find by the preponderance of evidence that the line located by Mr. Williams is on the line located by the original government survey, then the plaintiff cannot recover in any event. It will not do to permit boundaries to be disturbed and moved upon a survey made from an assumed starting point, without some proof of its being a true line, located and fixed by the original government survey. The only practical way of ascertaining the true line is by a survey made from some fixed starting point,— some monument placed under the original government survey; and, if such monuments are no longer discoverable, the question is, Where were they located? And fences of long standing, erected upon what parties have called the true line, and up to which they have improved and cultivated, are better evidence of the true line than surveys made after the monuments have disappeared."

The judge gave part of this request in his general charge, but failed to instruct the jury upon what evidentiary effect they should give to fences that had been erected a long time. We think, under the circumstances of this case, the jury should have been instructed in this respect. *Diehl* v. *Zanger*, 39 Mich. 601; *Beaubien* v. *Kellogg*, 69 Mich. 333 (37 N. W. 691).

Other assignments of error are discussed by counsel, but they are either not well taken or are not likely to arise again.

Judgment is reversed, and new trial ordered.

MONTGOMERY, C. J., LONG and GRANT, JJ., concurred with MOORE, J. HOOKER, J., concurred in the result.